*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-1509

JEAN-BAPTISTE BADO, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 06/21/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(DVM-1930-11)

(Hon. Jennifer M. Anderson, Motions Judge)
(Hon. Stuart G. Nash, Trial Judge)

(Argued En Banc June 14, 2016          Decided June 21, 2018)

*Alfred D. Carry*, with whom *Moses A. Cook*, D.C. Law Students in Court, was on the brief, for appellant.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, and *Michelle A. Parikh*, Assistant United States Attorneys, were on the brief, for appellee.

*Alice Wang*, with whom *Samia Fam*, Public Defender Service, and *Arthur B. Spitzer*, American Civil Liberties Union of the Nation's Capital, were on the brief, as *amici curiae*, in support of appellant.

*Kathy Doan*, *Heidi Altman*, *Claudia R. Cubas*, and *Rachel V. Jordan*, Capital Area Immigrants' Rights (CAIR) Coalition, were on the brief, as *amicus curiae*, in support of appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] GLICKMAN, FISHER, THOMPSON, BECKWITH, and EASTERLY, *Associate Judges*, and WASHINGTON,[**] and RUIZ, *Senior Judges*.

Opinion for the court by *Senior Judge* RUIZ, with whom *Chief Judge* BLACKBURNE-RIGSBY, and *Associate Judges* BECKWITH and EASTERLY, and *Senior Judge* WASHINGTON, join.

Concurring opinion by *Senior Judge* WASHINGTON, at page 38.

Concurring opinion by *Associate Judge* THOMPSON, at page 47.

Dissenting opinion by *Associate Judge* GLICKMAN, with whom *Associate Judge* FISHER joins, at page 56.

Dissenting opinion by *Associate Judge* FISHER, with whom *Associate Judge* GLICKMAN joins, at page 60.

RUIZ, *Senior Judge*: Jean-Baptiste Bado appeals his conviction for misdemeanor sexual abuse of a minor, after a bench trial, on the ground that he was denied the right to a jury trial guaranteed by the Sixth Amendment. The court, sitting en banc, is asked to decide whether the Sixth Amendment guarantees a right to a jury trial to an accused who faces the penalty of removal/deportation[1] as a

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on March 18, 2017.

[**] Senior Judge Washington was Chief Judge of the court at the time of argument. His status changed to Senior Judge on March 20, 2017.

[1] "The changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term 'removal' rather than 'deportation.'" *Padilla v. Kentucky*, 559 U.S. 356, 364 n.6 (2010) (quoting *Calcano-Martinez v. INS*, 533 U.S. 348, 350 n.1 (2001)). "A 'removable'

(continued . . .)

result of a criminal conviction for an offense that is punishable by incarceration for up to 180 days. By itself, that period of incarceration does not puncture the six-month line past which an offense is deemed "serious" and jury-demandable. We hold that the penalty of deportation, when viewed together with a maximum period of incarceration that does not exceed six months, overcomes the presumption that the offense is petty and triggers the Sixth Amendment right to a trial by jury. The conviction is reversed and the case remanded for a jury trial.

## I.

Appellant Jean-Baptiste Bado came to the United States on February 8, 2005, from Burkina Faso, where he was a pastor, fleeing at the time from "systematic[] prosecut[ion] and torture[]for his political and religious beliefs." Once in this country, he filed an application for asylum. His asylum proceeding continued for several years. It was halted in 2011, however, when he was charged

_____

(. . . continued)

individual is one whom the immigration authorities may lawfully expel from the United States; both 'deportable' and 'inadmissible' individuals are 'removable.'" *Coyomani-Cielo v. Holder*, 758 F.3d 908, 909 (7th Cir. 2014) (quoting *Zamora-Mallari v. Mukasey*, 514 F.3d 679, 687 n.2 (7th Cir. 2008)). In this opinion, we use the terms "removal" and "deportation" interchangeably.

by information with three counts of misdemeanor sexual abuse of a minor[2] because, if convicted, under U.S. immigration law he would be barred from receiving political asylum[3] and removed from the United States.[4] Appellant pleaded not guilty and demanded a jury trial, which was denied. At the bench trial, appellant took the stand and contradicted the charges, calling into question the complainant's credibility. He was acquitted of two of the charges but convicted of one count. He was sentenced to 180 days and ordered to pay $50 to the Crime Victims Compensation Program Fund and register as a sex offender for ten years. The United States commenced deportation proceedings on the basis of the conviction.

On appeal, a divided panel of the court reversed the conviction after concluding that appellant's right to a jury trial had been violated. *Bado v. United States*, 120 A.3d 50, 52 (D.C. 2015). On granting the government's petition for

---

[2] D.C. Code § 22-3010.01 (2012 Repl.).

[3] 8 U.S.C. §§ 1158 (b)(2)(A)(ii) & (B)(i) (2012) (denying eligibility to apply for asylum for those convicted of "particularly serious crime[s]," a definition which includes "aggravated felon[ies]"); 8 U.S.C. § 1101 (a)(43)(A) (2012) (categorizing sexual abuse of a minor as an "aggravated felony").

[4] 8 U.S.C. § 1227 (a)(2)(A)(iii) (2012) (providing that a person convicted of an aggravated felony (such as sexual abuse of a minor) "is deportable").

rehearing en banc, the division's opinions were vacated. *Bado v. United States*, 125 A.3d 1119 (D.C. 2015). After a further round of briefing by the parties and amici curiae, and oral argument, we now hold that appellant has a constitutional right to a jury trial. Therefore, we reverse his conviction and remand the case to permit appellant to have a trial free from structural error[5] and to receive the "basic protection" of a trial before a jury. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993).[6]

## II.

The Sixth Amendment guarantees a bundle of trial rights to the accused in "all criminal prosecutions." U.S. CONST. amend. VI. The first of these is "the right

---

[5] *See Fortune v. United States*, 59 A.3d 949, 956 (D.C. 2013) (denial of the right to a jury trial is a structural error, i.e., an error "so intrinsically harmful as to require reversal without regard to [its] effect on the particular trial's outcome").

[6] Appellant argued that he was entitled to a jury trial in light of the nature of the offense, "lasting social stigmas and inescapable societal disapproval" resulting from conviction of sexual abuse of a minor, and the combination of consequences that attend conviction of that offense: incarceration for up to 180 days, the possibility that he would be removed from the country, assessment of a monetary fine to the Crime Victims Compensation Fund, and the requirement to register as a sex offender for ten years. As we conclude that the combination of maximum incarceration of up to 180 days and possible deportation entitles appellant to a jury trial, we need not address the other grounds raised by appellant.

to a speedy and public trial, by an impartial jury . . . ." *Id.*[7] The Supreme Court has interpreted the scope of the jury trial right, in the light of the common law, as applying to criminal prosecutions for "serious offenses." *Duncan v. Louisiana*, 391 U.S. 145, 157-58 (1968). Criminal prosecutions for offenses that are not serious, but deemed to be "petty," may be tried by a judge without violating the Sixth Amendment.

The Supreme Court has set the parameters of what constitutes a "serious" offense under the Sixth Amendment. It is settled that any offense "where imprisonment for more than six months is authorized" cannot be considered "petty" for purposes of the right to trial by jury. *Baldwin v. New York*, 399 U.S. 66, 67, 69-70 (1970) (noting that the distinction between "felonies" and "misdemeanors" is not the constitutional dividing line and that some misdemeanors, such as "jostling,"[8] are deemed serious offenses). In *Blanton v.*

---

[7] Other rights guaranteed to the accused by the Sixth Amendment include the right "to be informed of the nature and cause of the accusation," "to be confronted with the witnesses against him," "to have compulsory process for obtaining witnesses" to present a defense, and "to have the [a]ssistance of [c]ounsel for his defen[s]e." U.S. CONST. amend. VI. The right to a jury in the "[t]rial of all [c]rimes" is also guaranteed by article III of the Constitution. *Id.* art. III, § 2, cl. 3.

[8] The statute on jostling was enacted to curb pickpocketing. *Baldwin*, 399 U.S. at 67 n.1. A person is guilty of jostling when that person "intentionally and
(continued . . .)

*City of N. Las Vegas*, 489 U.S. 538, 541-42 (1989), the Court set out the analytical framework to determine whether a particular offense punishable by incarceration for six months or less is to be deemed "serious," triggering the constitutional right to a jury trial, or "petty," leaving the question of a jury trial to resolution under other applicable law.[9]  Noting that the maximum exposure to incarceration is

_____

(. . . continued)

unnecessarily" places a hand in the proximity of a person's pocket or handbag or "[j]ostles or crowds another person at a time when a third person's hand is in the proximity" of the same.  N.Y. PENAL LAW § 165.25 (McKinney 2016).  Jostling is a Class A misdemeanor, punishable by no more than one year in jail.  *Id.* § 70.15 (McKinney 2016).

[9]  Most jurisdictions, either pursuant to state constitutions or statutory law, provide for a jury trial when a defendant faces the prospect of any period of incarceration.  See Senior Judge Washington's concurrence, *post* at 45 n.1; *see generally* DAVID L. HEMOND, CONN. GEN. ASSEMBLY, CONN. L. REVISION COMM'N, BRIEF REVIEW OF RIGHT IN 49 STATES TO JURY TRIAL FOR MINOR CRIMES (1998), https://www.cga.ct.gov/lrc/recommendations/1999%20recommendations/JuryTrial49StatesRpt.htm.

The District of Columbia is an outlier in this regard.  In the District of Columbia, unless the Constitution provides otherwise, the statutory right to demand a jury trial does not apply to offenses where the maximum exposure upon conviction is 180 days or less, one day shy of the six-month constitutional marker laid down in *Baldwin*, or a fine or penalty of less than $1,000.  D.C. Code § 16-705 (b)(1)(A) (2012 Repl.); *see Fretes-Zarate v. United States*, 40 A.3d 374, 378 n.3 (D.C. 2012) (noting that this "distinguish[es] the District from the vast majority of the fifty states in our union [that] afford . . . a right to a jury trial to anyone charged with a crime where there is a possibility of imprisonment for any period of time").  That limitation, together with the Omnibus Criminal Justice Reform Amendment Act of 1994, 41 D.C. Reg. 2608, 2609-12 (codifying D.C. Law 10-151, an earlier proposal entitled the Misdemeanor Streamlining Amendment Act), which reduced the maximum period of incarceration for a number of misdemeanor offenses to 180

(continued . . .)

usually the clearest indicator of the seriousness of an offense, the Court, following *Baldwin*'s lead, stated that offenses with a maximum period of incarceration of six months are "presum[ptively] . . . petty." *Id*. at 543. The Court, however, declined to hold that all such offenses "automatically qualif[y] as [] 'petty' offense[s]," and established that the presumption can be overcome "if [the accused] can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id*.

In *Blanton* the Court applied that test to a conviction for driving under the influence by assessing the statutorily authorized penalties that could be imposed upon conviction for DUI: incarceration from a minimum of two days to a maximum of six months, or, alternatively, 48 hours of community service dressed in clothing identifying the convicted defendant as a DUI offender; a maximum

_____

(. . . continued)

days, has had the intended effect of making more misdemeanor offenses triable before a judge in the District of Columbia. *See Burgess v. United States*, 681 A.2d 1090, 1094-95 (D.C. 1996) ("[T]he [act] . . . reduced the maximum penalties for a variety of crimes so as to make them non-jury-demandable."). The crime of misdemeanor sexual abuse of a minor was enacted in 2007 and is punishable by up to 180 days in jail and a maximum fine of up to $1,000. Omnibus Public Safety Amendment Act of 2006, 53 D.C. Reg. 8610, 8613, 8634-35 (codifying D.C. Law 16-306); D.C. Code § 22-3010.01 (a) (2012 Repl.). Thus, the statutory right to a

(continued . . .)

penalty of $1,000; a 90-day suspension of a driver's license; and mandatory attendance at an alcohol abuse education course at the offender's expense. 489 U.S. at 539, 544-45. The Court made clear that, in evaluating the seriousness of the offense, it considered the "*maximum* authorized prison sentence," *id*. at 544 (emphasis in original),[10] and that it considered only those potential penalties that are actually faced by the particular defendant, *id*. at 545, & n.12.[11] The Court reasoned that, because the maximum period of incarceration did not exceed six months, the offense was presumptively petty. *Id*. at 544. It then "[c]onsider[ed] the additional statutory penalties." *Id.* Of the distinctive garb required if the person were alternatively sentenced to a short period of community service, the Court stated that, even if it were "the source of some embarrassment," it would be

_____

(. . . continued)
jury trial does not apply to this offense. *See* D.C. Code § 16-705 (b)(1)(A). Appellant's claim to a jury trial is therefore based on the Sixth Amendment.

[10]   In using maximum exposure, the Court followed *Baldwin*'s analysis: "The *possibility* of a sentence exceeding six months, we determined, is 'sufficiently severe by itself' to require the opportunity for a jury trial." *Blanton*, 489 U.S. at 542 (emphasis added) (quoting *Baldwin*, 399 U.S. at 69 n.6). *See Frank v. United States*, 395 U.S. 147, 149 (1969) ("In ordinary criminal prosecutions, the severity of the penalty authorized, not the penalty actually imposed, is the relevant criterion.").

[11]   The Court noted that it would not consider possible enhanced incarceration for repeat offenders because the petitioners in the case were first-time offenders; it left open the question "whether a repeat offender facing enhanced

(continued . . .)

"less embarrassing and less onerous than six months in jail." *Id*.[12] The Court considered the license suspension and concluded it was not "that significant" as a Sixth Amendment matter, in part because the record was unclear as to whether the suspension would be concurrent with the six-month incarceration, in which case it would be "irrelevant," and because a restricted license could be obtained after forty-five days. *Id*. & n.9.[13] The Court dismissed the mandatory alcohol abuse education course as a "*de minimis*" requirement. *Id.* at n.9. After taking into account all of the possible maximum statutory penalties that could be applied to the defendant, the Court concluded that "[v]iewed together, the statutory penalties are not so severe that DUI must be deemed a 'serious' offense for purposes of the Sixth Amendment." *Id*. at 545. The Court applied a *Blanton* analysis one other time, in *United States v. Nachtigal*, another case that involved operating a motor

_____

(. . . continued)

penalties may state a constitutional claim because of the absence of a jury trial in a prior DUI prosecution." *Blanton*, 489 U.S. at 545 & n.12.

[12] Even so, the Court noted that it was "hampered" in its review of the clothing requirement because the record did not contain a description of the clothing or details "as to where and when it must be worn," seemingly reserving the possibility that a fuller record that showed a highly embarrassing or onerous requirement could yield a different outcome. *Blanton*, 489 U.S. at 545 n.10.

[13] A longer license suspension has been held to tip an otherwise presumed petty DWI offense into the serious offense category. *Richter v. Fairbanks*, 903 F.2d 1202, 1204 (8th Cir. 1990) (holding that "15-year license revocation, considered together with the maximum six month prison term, is a severe enough

(continued . . .)

vehicle while intoxicated.  507 U.S. 1, 2 (1993).  The possibility of a five-year probation and $5,000 fine did not convert the presumptively petty offense to a serious one for jury trial purposes, the Court held, because they did not approximate or entail as great a loss of liberty as the possibility of imprisonment for more than six months. *Id*. at 5.

## III.

We apply a *Blanton* analysis in this case.  In light of the 180-day maximum exposure to incarceration for misdemeanor sexual abuse of a minor, we begin with the presumption that the offense is "petty" for Sixth Amendment purposes.  The question before us is whether the possibility of deportation refutes that presumption.  We note the obvious:  there is no comparison between the penalty of deportation and the statutory penalties considered in *Blanton* (temporary license suspension, embarrassing clothing to be worn during two days of community service, and alcohol abuse education course) that were deemed not significant enough to render the DUI offense serious under the Sixth Amendment.  Like incarceration, deportation separates a person from established ties to family, work,

_____
(. . . continued)
penalty to indicate that the Nebraska legislature considers third-offense DWI a
(continued . . .)

study, and community. In this forced physical separation, it is similar "in severity [to] the loss of liberty that a prison term entails." *Blanton*, 489 U.S. at 542 (distinguishing probation and fines which, although they "may engender 'a significant infringement of personal freedom,' . . . cannot approximate in severity the loss of liberty that a prison term entails") (internal citation omitted) (quoting *Frank v. United States*, 395 U.S. 147, 151 (1969)). *Baldwin* held that the possibility of a sentence in excess of six months automatically renders an offense serious under the Sixth Amendment, entitling the accused to a jury trial. Removal, however, can be more severe than the possibility of a six-month sentence of incarceration. Once the actual sentence is served (which could be for a term less than the six-month maximum, or even only probation), a U.S. citizen can return home to family and community and take steps to resume and, possibly, redirect his life. But when a person faces deportation, serving the sentence is only the first step following conviction; once the sentence is completed, the person faces the burdens and anxiety that attend detention pending removal proceedings. Upon removal, the physical separation from family and community lasts at least ten years and, for some, including Mr. Bado, exclusion from the country becomes permanent.[14] This

_____

(. . . continued)
serious crime").

[14] A person who is deportable as a result of conviction for any crime identified in 8 U.S.C. § 1227 (a)(2) will be placed in removal proceedings under 8

(continued . . .)

disruption causes harm and suffering to those who are forced to leave and those who remain. Wrenching decisions might have to be made within the family, which could be left without an important source of emotional and financial support. Those families often include children and other family members who are United States citizens and who may be forced to leave this country to preserve familial bonds with a parent or other relative no longer able to remain in the United States, or to continue to receive their financial support.[15] For some, deportation may expose them to harsh conditions in their country of origin including extreme poverty, violence and oppression and persecution based on religious and political beliefs. As the Court has recognized, removal is considered by many immigrants to be worse than incarceration, such that "preserving the [] right to remain in the

_____

(. . . continued)
U.S.C. § 1229a. 8 U.S.C. § 1229a (a)(1) & (2) (2012). Those convicted of an aggravated felony who were removed under 8 U.S.C. § 1229a are rendered ineligible for readmission to the United States, meaning they are forever barred from entering the country unless the Attorney General consents to the application for admission. *Id.* § 1182 (a)(9)(A)(ii)(II) (2012). Those convicted of a crime involving moral turpitude or a crime related to a controlled substance are similarly permanently inadmissible and deportable. *Id.* §§ 1182 (a)(2)(A), 1227 (a)(2)(A)(i), & 1227 (a)(2)(B)(i) (2012). Those who were removed for other grounds are eligible to apply for readmission after ten years (following a first order of removal) and twenty years (following a second order of removal). *Id.* § 1182 (a)(9)(A)(ii) (2012).

[15] AJAY CHAUDRY, ET AL., THE URBAN INST., FACING OUR FUTURE: CHILDREN IN THE AFTERMATH OF IMMIGRATION ENFORCEMENT 27-33, 41-51 (Feb. 2010) https://www.fcd-us.org/assets/2016/04/FacingOurFuture.pdf.

United States may be more important [] than any potential jail sentence." *Lee v. United States*, — U.S. —, 137 S. Ct. 1958, 1968 (2017) (quoting *Padilla*, 599 U.S. at 368).

The Supreme Court has "long recognized that deportation is a particularly severe 'penalty,'" equating it to "banishment." *Padilla*, 559 U.S. at 365, 373 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)); *see, e.g.*, *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948) ("[D]eportation is a drastic measure and at times the equivalent of banishment or exile."); *Fong Yue Ting*, 149 U.S. at 740 (Brewer, J., dissenting) ("Every[]one knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel."). Removal that results from conviction erects a bar to entry into the United States,[16] with all the grave consequences that preclusion entails: loss of our country's constitutional protections, the ability to engage with its social institutions, and access to educational and economic opportunities. These are the cherished values that have beckoned to people in other lands since our country's founding and continue to provide hope for those seeking a better life and refuge for those escaping violence and persecution. Their loss is so great as to be

unquantifiable. The loss of liberty, akin to incarceration, that results from removal as well as the Court's repeated statements about its severity, lead us to conclude, under a *Blanton* analysis, that deportation is so "onerous" a penalty for conviction that it presents the "rare situation" that should ensure the availability of a jury trial in a criminal proceeding even though the penalty of incarceration does not "puncture the six-month incarceration line." *Blanton*, 489 U.S. at 543.

## IV.

The government agrees that, under *Blanton*, there is a two-step analysis: (1) identification of the penalties for conviction of an offense, and (2) an evaluation of whether the penalties, viewed together, are sufficiently severe to warrant a jury trial by comparison to the possibility of imprisonment for more than six months, which the Court has established (when considering only incarceration) as the constitutional dividing line between petty and serious offenses. The government does not dispute that deportation is a severe penalty. The government's arguments boil down to one contention, that deportation is not the type of penalty that *Blanton* contemplated should be taken into account in determining whether an offense is

_____
(. . . continued)
[16] See *supra* note 14.

deemed serious under the Sixth Amendment. Specifically, the government contends that: (1) removal is not a penalty for a criminal offense; (2) removal should not be considered because it is imposed by Congress, not the Council of the District of Columbia, which created the offense; (3) longstanding precedent establishes that deportation is not "punishment"; and (4) the courts of the District of Columbia are not competent to determine the deportation consequence of criminal conviction. As we now discuss, we are not persuaded by the government's arguments to diverge from a straightforward application of a *Blanton* analysis that includes the penalty of deportation.

### A. Deportation is a Penalty for a Criminal Conviction

As the Court has recognized, "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century." *Padilla*, 559 U.S. at 365-66. In this case, there is no dispute that the offense of misdemeanor sexual abuse of a minor exposes appellant to removal. Appellant had been in proceedings seeking asylum that were terminated pending his criminal trial because, if convicted, he would be ineligible for asylum and deported.[17] The government sought to deport him upon his conviction. The government argues, however, that removal, even if it

is triggered by a criminal conviction, is a "civil" sanction that should not be considered in a *Blanton* analysis. We disagree. As *Blanton* emphasized, whether the Sixth Amendment guarantees a jury trial is determined by reference to the possible statutory "penalties" that "attach[] to" conviction of the offense:

> In using the word "penalty," we do not refer solely to the maximum prison term authorized for a particular offense. A legislature's view of *the seriousness of an offense also is reflected in the other penalties that it attaches to the offense*. We thus examine "whether the length of the authorized prison term *or the seriousness of other punishment* is enough in itself to require a jury trial."

489 U.S. at 542 (first emphasis added and internal citation omitted) (quoting *Duncan*, 391 U.S. at 161). The Court did not parse whether "the other penalties" were "penal" or "civil" in nature, and took care to consider the relative burdens imposed by each of several penalties that were "civil" in nature: temporary license suspension, 48 hours of community service, a fine, and required attendance at an alcohol abuse education course. *Id.* at 543-44. We see no foothold in *Blanton* for the distinction the government urges in this appeal.

_____
(. . . continued)
[17] See *supra* notes 3 & 4.

Reprising the "civil" versus "penal" point, the government argues that removal resulting from conviction is merely the prescribed remedy in a regulatory-type proceeding that enforces provisions in the immigration laws that define who is permitted to stay in the country.[18] No one doubts that the government has the power to deport persons, so long as it is exercised pursuant to statutory authority and consistent with the Constitution. That is not the issue here. In this case, we are concerned with the constitutional rights guaranteed to the accused under the Sixth Amendment in a criminal prosecution that could result in deportation. The

---

[18] The government cites several cases for the proposition that deportation is not "punishment" for a criminal offense. None, however, deals with the Sixth Amendment question presented in this appeal and all addressed deportation in a context that did not involve a criminal prosecution. The first set of cases invoke Congress's authority to define groups of people to exclude or remove from the United States. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488-91 (1999) (relying on the executive's broad prosecutorial discretion to hold that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation" when a person, not convicted of any crime, is removed for overstaying a visa or is in the United States under a student visa, but is not in school); *Bugajewitz v. Adams*, 228 U.S. 585, 591 (1913) (holding that deportation pursuant to Congress's power to exclude women suspected of being prostitutes, where no criminal prosecution was involved, did not violate the Ex Post Facto Clause); *Fong Yue Ting*, 149 U.S. at 699 n.1, 730 (affirming Congress's power to exclude Chinese nationals who had lived in the United States for a number of years under the Chinese Exclusion Act; no criminal proceedings were involved). Another case held that the removal hearing itself is not a criminal proceeding. *See Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038, 1045-46 (1984) (holding that the Fourth Amendment exclusionary rule was inapplicable in removal proceedings because it was not a criminal proceeding, where a person's status as a noncitizen was discovered only as a result of an unlawful arrest).

government's argument that deportation, as a civil penalty, is not relevant to our inquiry is refuted by *Blanton*, where the Court considered the possible penalty of license suspension following conviction for DUI relevant in deciding whether the Sixth Amendment guarantees that apply to criminal prosecutions required a jury trial. A license can be suspended, even in the absence of conviction, for purely regulatory reasons such as failure to renew or driving without prescribed vision correction, just as a person may be subject to removal for violating the terms of admission absent a criminal conviction. Yet, in *Blanton*, the Court took into account the possibility of a license suspension as part of its Sixth Amendment analysis because the statute provided that suspension of licensing privileges was a penalty for a DUI conviction. Similarly here, a statutory provision imposes deportation as a penalty for conviction.

Moreover, the argument that characterizes deportation as a "non-criminal" sanction is at odds with (and relies on cases that precede) current law and practice under the 1996 amendments to the Immigration and Naturalization Act ("INA")[19] which provide that removal proceedings are triggered by conviction of a number of state and federal offenses. Cognizant of these changes in the law, the Court has

soundly rejected the notion that removal is merely a collateral consequence of criminal conviction, distinct from a criminal penalty, and has instead recognized that "as a matter of federal law, deportation is an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants." *Padilla*, 559 U.S. at 364. The "drastic measure of deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes." *Id*. at 360 (internal citation and quotation omitted). To characterize deportation in a case like this as merely a civil remedy separate from the penalty for conviction is not only contrary to *Blanton*'s analysis; it also flies in the face of the Court's repeated statements in recent opinions that the penalty of removal plays a central role in criminal proceedings involving noncitizens. *See Sessions v. Dimaya*, 584 U.S. ____, 138 S. Ct. 1204, 1213 (2018) ("[A]s federal immigration law increasingly hinged deportation orders on prior convictions, removal proceedings became ever more 'intimately related to the criminal process.'" (quoting *Chaidez v. United States*, 568 U.S. 342, 352 (2013) (in turn quoting *Padilla*, 559 U.S. at 365)). The civil/criminal distinction the Court said in *Padilla* is "ill suited" to evaluating a Sixth Amendment claim of ineffective

_____

(. . . continued)

[19] Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1274 (codified as amended at 8 U.S.C. § 1227 (a)(2)(A)(i)(II) (2012)).

assistance of counsel, *id.* at 366, is equally ill-suited to evaluating a claim to a jury trial, which is another in the group of rights guaranteed by the Sixth Amendment to the accused in a criminal prosecution.[20] *Cf. Dimaya*, 584 U.S. at ____, 138 S. Ct. at 1212-13 (noting government's civil/criminal distinction and rejecting the argument that because deportation is a civil sanction, a less searching standard should apply in a due process evaluation of a void-for-vagueness challenge under the Fifth Amendment).

Finally, the argument that deportation is simply a civil measure also overlooks that harsher substantive and procedural requirements apply when deportation is triggered by a criminal conviction than in "regulatory" deportations, such as when a person is out of status (*e.g.*, a person who is working without authorization or enters on a student visa and is no longer in school). Those who are removed as a result of a criminal conviction are ineligible for reentry for a longer period or permanently barred,[21] they are more likely to be detained pending removal proceedings, and, once a removal order has been entered, they are also streamlined through expedited removal proceedings, subjected to additional periods of detention, and extremely limited in their eligibility for relief from

---

[20] See *supra* note 7.

deportation.[22]  These harsher provisions are not generally applicable, nor are they

triggered by any circumstance other than the conviction of a crime (or admission of

_____

(. . . continued)

[21] See *supra* note 14.

[22]  For example, conviction of an aggravated felony renders a person "conclusively presumed to be deportable," 8 U.S.C. § 1228 (c) (2012); subjects them to "expedit[ed] removal," forcing the person to counter removal proceedings from jail, *id.* § 1228 (a)(1) & (3) (2012) ("[T]he Attorney General shall provide for the initiation and, to the extent possible, the completion of removal proceedings, and any administrative appeals thereof, in the case of any alien convicted of an aggravated felony before the alien's release from incarceration for the underlying aggravated felony."); and makes them ineligible for judicial review of the final order of deportation, except under limited circumstances, *id.* § 1252 (a)(2)(C) & (D) (2012) ("[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [a crime involving moral turpitude or relating to a controlled substance] or [an aggravated felony]," with the exception of "constitutional claims or questions of law."). They are precluded from applying for asylum, *id.* § 1158 (b)(2)(B)(i) (2012); cancellation of removal, *id.* § 1229b (b)(1)(C) (2012); or a waiver of "inadmissib[ility] or deportab[ility]" under the Violence Against Women Act, *id.* § 1229b (b)(2)(A)(iv) (2012).  They are also categorically excluded from being granted voluntary departure (and thus, the opportunity to avoid a prior order of removal on their record).  *Id.* § 1229c (a)(1) & (b)(1)(C) (2012).  There are no similar provisions for those not convicted of crimes.

Similarly, although any noncitizen *may* be arrested and detained pending a decision on whether the person is to be removed from the United States, *id.* § 1226 (a) (2012), those not convicted of a crime may be released on bond or conditional parole, *id.*, while those convicted of certain crimes (e.g., an aggravated felony or a crime involving moral turpitude) *must* be taken into custody and may not be released, except in limited circumstances found by the Attorney General to be necessary to protect a witness involved in an investigation into major criminal activity, *id.* § 1226 (c) (2012).  Additionally, although a person who has been ordered removed is to be detained, the Attorney General has discretion not to detain a person between the time the order of removal is entered and when the person is actually removed, with the exception of those convicted of an aggravated

(continued . . .)

criminal behavior) and, thus, distinguish removal upon conviction from regulatory removals. As the Court has observed, once a noncitizen has been convicted of a removable offense, detention and removal are "practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General." *Padilla*, 559 U.S. at 363-64. Exercise of these "limited remnants" of executive discretion is rare as the government's enforcement policies have prioritized the removal of persons who have been convicted of crimes, ensuring that they are much more likely to be deported than others who could be removed as part of the regulatory process.[23]

The government argues that removal should not be considered a penalty in a *Blanton* analysis because (1) the sentencing court does not have authority to order

_____

(. . . continued)

felony, who must be detained during this time, 8 U.S.C. § 1231 (a)(2) (2012), and could continue to be detained beyond the prescribed removal period, if removal does not actually occur during this period of time, *id.* § 1231 (a)(6) (2012).

[23] Exec. Order No. 13768, 82 Fed. Reg. 8799, 8800 (Jan. 30, 2017) (Trump administration); MEM. FROM JOHN MORTON, DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, TO ALL ICE EMPLOYEES, RE: CIVIL IMMIGRATION ENFORCEMENT: PRIORITIES FOR APPREHENSION, DETENTION, AND REMOVAL OF ALIENS (Mar. 2, 2011) (Obama administration).

deportation upon conviction for a deportable offense[24] and (2) there would be an "anomaly" if a noncitizen would be entitled to a jury trial but a citizen would not. Neither of these is a factor whose relevance can be gleaned from *Blanton*, which focused on the possible penalties faced by the accused claiming the right to demand a jury trial, without regard to the mechanics by which the penalty is imposed. For example, the Court's consideration of the license suspension for the DUI conviction in *Blanton* was not dependent on whether it was imposed by the

---

[24] In the past, deportation was dismissed as "collateral" and therefore not integral to a criminal prosecution, in part based on reasoning that, following conviction, there was an intervening decision-maker and proceeding, which attenuated the connection between a criminal conviction and removal. *See Padilla*, 559 U.S. at 361-63 (discussing both the use of a "judicial recommendation against deportation, or JRAD" between 1917 and 1990, which acted as a bar against deportation, as well as the end of the Attorney General's authority to grant discretionary relief). As *Padilla* explained, that is an outdated view that has been overtaken by changes to the INA initiated in 1996 and is not determinative of the scope of the Sixth Amendment right to effective assistance of counsel. *See id.* at 363-64 & n.5. We reject statements to the contrary made in *Foote v. United States*, 670 A.2d 366, 372 (D.C. 1996), decided pre-*Padilla*, and *Olafisoye v. United States*, 857 A.2d 1078, 1084 (D.C. 2004) (citing *Foote*). Moreover, it appears that the issue of deportation was moot in both cases. *Foote* involved a defendant who might have been a U.S. citizen and, therefore, was not deportable, 670 A.2d at 372 (opinion does not state that defendant was not a U.S. citizen and refers to "hypothetical civil or administrative proceedings . . . [that] in most cases could not be brought against [the defendant]"); the offenses at issue in *Olafisoye* did not render the noncitizen in that case deportable upon conviction, 857 A.2d at 1083, 1084 & n.6. Judge Fisher's dissent's reliance on *People v. Suazo*, 45 N.Y.S.3d 31, 32 (N.Y. App. Div. 2017), *leave to appeal granted*, 64 N.Y.S.3d 117 (2017), is similarly unpersuasive because in that case, the immigration impact of the conviction was "unclear" and the court continued to cite the discredited notion that deportation is "still collateral." *Id.*

sentencing court. 489 U.S. at 539 (citing Nev. Rev. Stat. § 483.460 (1)(c)) (noting that suspension occurred "automatically"). Moreover, by expressly declining to consider other enhanced penalties that were not faced by the accused individual, *id.* at 545 n.12, *Blanton* made clear that what is relevant to the Sixth Amendment analysis are the potential penalties to which the particular defendant is exposed upon conviction. [25] In an analogous circumstance, we have rejected a claim that an enhanced penalty for recidivism triggers a jury trial right where the defendant was not "personally" facing the penalty. *See Brown v. United States*, 675 A.2d 953, 954 (D.C. 1996). Thus, because citizens can never be deported, it is hardly anomalous that *Blanton*'s penalty-oriented Sixth Amendment analysis could render a different result for citizens than for noncitizens who face the additional, and concededly serious, penalty of deportation.[26] Similarly, it would not be anomalous

---

[25] For this reason, the holding in *Amezcua v. Eighth Judicial Dist. Court* is not persuasive authority as the appellant in that case conceded he was a U.S. citizen and, thus, was not subject to deportation if convicted. *See* 319 P.3d 602, 604 n.3 (Nev. 2014).

[26] It is well settled that the Constitution generally, and the Sixth Amendment jury trial right in particular, apply to persons in the United States, not only to citizens of the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 694-95 (2001) (detailing the history of applying protections of the Constitution to "all persons within the territory of the United States"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth and Sixth A]mendments.")

if one citizen who faces a more severe penalty such as a greater period of incarceration for a repeat offense is entitled to a jury trial whereas another citizen who faces lesser penalties is not.[27] The government offers no compelling reason why we should engraft additional requirements to the factors set out by the Court that are not relevant to *Blanton*'s focus on the potential penalties that are faced by the accused individual. If, viewed together with the maximum period of incarceration, the penalties' severity is comparable to a prison sentence of more than six months, the Sixth Amendment entitles the accused to a jury trial.[28]

---

[27] Although Judge Fisher's dissent acknowledges that a repeat offender may be entitled to a jury trial if exposed to a greater penalty for the same offense committed by a first-time offender, it reasons that a recidivist could be deemed to have committed an "aggravated form" of the offense: a "*different* offense with a different maximum sentence." *Post* at 68. The same could be said here, where the noncitizen is deemed to have committed an "aggravated felony," see *supra* note 3, and, as a result, is subject to a more severe penalty than the citizen. We are also unpersuaded by the dissent's reliance on *Lewis v. United States*, 518 U.S. 322 (1996). *Lewis* dealt with an entirely different situation, where a defendant claimed to have a right to a jury trial because he faced potential aggregate incarceration of more than six months if convicted of two counts of the same offense (obstructing the mail), which was undisputedly "petty." Id. at 324-25. As the Court observed, the "penalty authorized by Congress manifests its judgment that the offense is petty." *Id.* at 328. Here, the penalty of deportation manifests the legislative judgment that conviction of a single count of sexual abuse of a minor is serious.

[28] Judge Fisher's dissent cites *Brown*, 675 A.2d at 955, for the proposition that even if removal is triggered by a criminal conviction, it is not "part of the punishment for the crime." *Post* at 65. Reliance on *Brown* is inapt. *Brown* rejected a defendant's claim that a *subsequent* conviction of a petty offense, which activated a suspended sentence imposed in a *previous* criminal proceeding, triggered the jury trial right in the prosecution of the subsequent offense, reasoning

(continued . . .)

**B.   Congress Has Imposed the Deportation Penalty for Criminal Conviction**

The government further argues that removal that is triggered by a criminal conviction should not be taken into account because it is a penalty that results from a congressional enactment and is not part of the penalty designated by the legislature that created the offense, in this case, the Council of the District of Columbia.  This argument misapprehends *Blanton*'s meaning and is contrary to its purpose.[29]  In *Blanton*, the Court rejected the notion that a court may gauge the seriousness of an offense for Sixth Amendment purposes by coming to a subjective

_____

(. . . continued)

that Brown "mistakenly characterize[d]" the reimposed sentence "as an additional statutory penalty attributable to the present offense," which was, instead, "a continuation of the prosecution of his first offense."  675 A.2d at 955.  Thus, it did not constitute punishment for the conviction in the criminal prosecution for which the jury trial was demanded.  *Id*.  Here, on the other hand, by statute, the deportation penalty attaches directly upon conviction of the offense in the criminal prosecution for which appellant claims the right to a trial by jury.

[29]  The government's argument rests on a sentence in a footnote in *Blanton* in which the Court refused to consider the penalties for DUI "in other [s]tates."  489 U.S. at 545 n.11.  But these were penalties that did not apply to the petitioners before the Court, who faced only penalties imposed by the state of Nevada.  In the same footnote, the Court also noted that it "frequently looked to the federal classification scheme in determining when a jury trial must be provided."  *Id*.  As noted, federal law classifies sexual abuse of a minor as an "aggravated felony."  8 U.S.C. § 1101 (a)(43)(A), and imposes the penalty of deportation upon conviction of this and other specified offenses, *id*. § 1227 (a)(2)(A) (2012).

judgment about the "nature" of the offense. 489 U.S. at 541-42, & n.5. Instead, the seriousness of an offense is to be assessed by reference to objective standards — penalties — "resulting from state action, *e.g.*, those mandated by statute or regulation." *Id.* at 543 n.8. Through the penalties mandated by public officials and elected representatives, "the laws and practices of the community [are] taken as a gauge of its social and ethical judgments." *Id.* at 541 n.5 (citing *District of Columbia v. Clawans*, 300 U.S. 617, 628 (1937)).[30] Congress, as the national legislature, is presumed to reflect the nation's social and ethical judgments; moreover, it is the only legislative body that can prescribe the penalty of removal for a criminal conviction. *See United States v. Arizona*, 641 F.3d 339, 349 (9th Cir. 2011), *partially rev'd on other grounds*, 567 U.S. 387 (2012) ("[R]emoval is exclusively the purview of the federal government.")) That penalty is triggered by conviction of an offense that falls within offense classifications identified by Congress in the INA, regardless of whether the conviction results from violations of federal, state, or District of Columbia law.[31] There is no reason grounded in the

---

[30]   The legislature is "far better equipped to perform the task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions." *Blanton*, 489 U.S. at 541-42 (alteration in original) (quoting *Landry v. Hoepfner*, 840 F.2d 1201, 1209 (5th Cir. 1988)).

[31]   Judge Glickman's dissent relies on two unpublished federal district court opinions, from California and Kentucky, for the proposition that the deportation

(continued . . .)

_____

(. . . continued)

penalty should not be considered because it was imposed by Congress. *Post* at 57 n.3. These cases address state SORA registration requirements, not deportation; in this opinion we do not address appellant's claim that sex offender registration entitles him to a jury trial. See *supra* note 6. In any event, we find these opinions unpersuasive. In *Rauch v. United States*, where the defendant pleaded guilty to a federal offense, the district court stated that the view of the state of California, which imposed the registration requirement, was irrelevant on the question of the seriousness of the federal offense as the registration requirement was not enacted by Congress "in conjunction with" the offense. No. 1:07-CV-0730 WMW, 2007 U.S. Dist. LEXIS 72616, *8-9 (E.D. Cal. Sept. 28, 2007). The opinion does not explain what "in conjunction with" means; we note, however, that in the case before us, Congress enacted the penalty of deportation to attach, specifically, to conviction for "sexual abuse of a minor," the offense of which appellant was convicted under D.C. Code § 22-3010.01. See *supra* notes 2 and 4. Having dismissed California's views as irrelevant, *Rauch* then does an about-face and relies on California's interpretation that its sex offender registration requirement is not punishment "for purposes of state and federal ex post facto analysis." *Id.* at *9 (citing *People v. Castellanos*, 982 P.2d 211, 212 (Cal. 1999)). As we discuss in the next section, analysis under the Sixth Amendment guarantee to a jury trial is fundamentally different from analysis under the Fifth Amendment's Ex Post Facto and Double Jeopardy Clauses because of differences in the constitutional text and rights protected.

The *Ivy* case is similarly unpersuasive as it relies on *Rauch*. It also relies on this court's conclusion, in a plain error case, that because SORA registration is a "regulatory" measure that does not offend the Fifth Amendment Ex Post Facto and Double Jeopardy Clauses, it does not trigger the right to jury trial. *Ivy v. United States*, No. 5:08-CR-00021-TBR, 2010 U.S. Dist. LEXIS 28933, *7 (W.D. Ky. March 26, 2010) (citing *Thomas v. United States*, 942 A.2d 1180, 1186 (D.C. 2008) (in turn citing *In re W.M.*, 851 A.2d 431, 440-51 (D.C. 2004) (upholding constitutionality of sex offender registration against Fifth Amendment challenges))); *see id.* (citing *Cutshall v. Sundquist*, 193 F.3d 466, 476 (6th Cir. 1999) (upholding constitutionality of Tennessee's sex offender registration statute against a challenge based on the Ex Post Facto Clause, Double Jeopardy Clause and as a Bill of Attainder). *Ivy* also relied on the short period of maximum incarceration, "ninety days, significantly less than the threshold amount of six months." *Id.* at *9.

purpose of *Blanton's* penalty-based analysis to exclude from Sixth Amendment consideration the serious penalty of removal that attaches to a criminal conviction, and to which the accused is exposed, because it has been imposed by Congress rather than the local legislature.[32]

## C. Principles Applicable to Constitutional Provisions Other Than the Sixth Amendment Right to Jury Trial

---

[32] Congress could decide, for example, that certain otherwise "petty" state offenses punishable by no more than six-months imprisonment should have an enhanced prison sentence of one year in order to address a crisis that affects the nation as a whole. In such a case, there can be little doubt that the enhanced maximum period of incarceration would weigh in the *Blanton* analysis because the accused would face the greater period of incarceration, regardless of whether the underlying state offense, without the congressionally imposed enhancement, would be deemed petty.

The government and Judge Fisher's dissent rely on *State ex rel. McDougall v. Strohson*, 945 P.2d 1251, 1256 (Ariz. 1997) (en banc), which considered the federal prohibition on firearms possession by persons convicted of certain state offenses, and concluded that the federal prohibition did not convert the underlying petty offense into a serious one for Sixth Amendment purposes. But that reliance is inapt. In concluding that the defendant in that case was not entitled to a jury trial, the court relied on an analogy to state precedent that counsel had no obligation to advise a pleading defendant that "he might be subjecting himself to deportation under federal law." *Id.* That state law precedent has since been overruled, on constitutional grounds, by *Padilla*, and is in tension with D.C. law, which requires that a pleading defendant be informed of the possibility of immigration consequences. *See* D.C. Code § 16-713 (2012 Repl.). In addition, *Strohson* is inapposite as the court in that case observed that the inability to possess a firearm, "while admittedly very important to some people, does not present the type of universal grave consequence we have found in cases invoking a right to jury trial." *Strohson*, 945 P.2d at 1256. As we have discussed, the Court has recognized that deportation is such a grave consequence of a criminal conviction.

The government points to cases holding that deportation is not "punishment" for a crime and argues that *Padilla*'s acknowledgement that it is a serious penalty central to a criminal conviction did not *sub silentio* overrule them. The cases on which the government relies are not on point because they did not present a Sixth Amendment claim, but arose under different constitutional provisions, the Double Jeopardy Clause of the Fifth Amendment, U.S. CONST. amend. V, and the Ex Post Facto Clause, *id.*, art. I, § 10. This is a significant difference. Because the Constitution's text is silent as to how these Clauses are to be applied, the Court has ruled that the question turns on whether a law "retroactively alter[s] the definition of [a] crime[] or increase[s] the punishment for criminal acts," *Collins v. Youngblood*, 497 U.S. 37, 43 (1990) (Ex Post Facto Clause); or whether the state is "punishing twice, or attempting a second time to punish criminally, for the same offense," *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) (Double Jeopardy Clause). The threshold question of whether either of these Clauses applies in a particular case therefore depends on whether the law or government action under judicial review involves a criminal offense or punishment for a crime.[33] There is

---

[33] Thus, in deciding whether these particular constitutional guarantees are implicated, the Court has had to devise tests to interpret the state's motivation behind the challenged actions and the effect of the sanctions. For example, in *Smith v. Doe*, 538 U.S. 84, 89-90, 92-93, 105-06 (2003), the Court employed the

(continued . . .)

no similar threshold question here, however, because the Sixth Amendment by its terms applies to "all criminal prosecutions," U.S. CONST. amend. VI, and this case involves a criminal prosecution. The question before us is different, whether the penalties that attach if the criminal prosecution results in a conviction for misdemeanor sexual abuse of a minor meet the Court's definition of what constitutes a "serious" offense that would entitle the accused to demand that the criminal prosecution be presented to, and decided by, a jury. This explains why *Padilla*, which also dealt with the scope of another of the Sixth Amendment rights of the accused in a criminal prosecution — the right to effective assistance of counsel — did not need to overrule any of the cases cited by the government, which arose under other constitutional provisions.[34] *Padilla* recognizes that

_____

(. . . continued)

"intent-effects" test to determine whether, in imposing a registration requirement for sex offenders under ALASKA STAT. § 12.63.010 with retroactive effect, the legislature intended to establish non-punitive civil proceedings or to impose punishment in deciding whether the Ex Post Facto Clause applied. In *United States v. Ursery*, 518 U.S. 267, 271-72, 278 (1996), the Court employed the "intent-effects" test to determine whether the Double Jeopardy Clause applied when an *in rem* civil forfeiture proceeding of property used in connection with illegal drug transactions had preceded a criminal prosecution based on the same underlying drug transactions. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (listing factors considered under the "intent-effects" test).

[34] The government refers to *Padilla*'s citation of *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), as a reaffirmation of the holding of that case. But *Padilla* cited *Fong Yue Ting* for the proposition that removal is a "particularly severe 'penalty.'" 559 U.S. at 365 (quoting *Fong Yue Ting*, 149 U.S. at 740). The

(continued . . .)

deportation, even though "it is not, in a strict sense, a criminal sanction," because of its "unique nature," is nonetheless a "penalty" that is so "enmeshed" in the criminal consequences of a conviction that it triggers the right to the assistance of counsel under the Sixth Amendment. 559 U.S. at 365-66. Thus, even though it did not decide the question presented in this case, *Padilla* supports (and the cases on which the government relies do not undermine) that removal is a penalty to be factored in when applying the Court's penalty-oriented *Blanton* analysis to determine whether the accused has a Sixth Amendment right to a jury trial in a criminal prosecution.

### D. Practicality of Application

Finally, the government asserts that there are "practicalities and uncertainties" as to whether conviction of an offense renders a defendant removable which could make application of a *Blanton* analysis difficult in some

_____
(. . . continued)
case before us does not implicate *Fong Yue Ting*'s holding that certain constitutional provisions, including the right to jury trial, do not apply to *deportation proceedings* because they are not criminal proceedings; appellant's claim in this case is to a jury trial in a *criminal prosecution* that is indisputably covered by the Sixth Amendment.

cases.[35] The government does not argue that any such difficulties are presented in this case, as it agrees that appellant's conviction makes him deportable.[36] Our holding today is clear: the Sixth Amendment entitles a defendant to a jury trial if he is charged with a deportable offense, even if the maximum period of incarceration does not exceed six months. The statutory basis for the deportation penalty is readily ascertainable, as the INA identifies categories of offenses that render a convicted noncitizen defendant deportable. *See* 8 U.S.C. § 1227 (a)(2) (2012).[37] There is no dearth of law on the subject: decisions of the Board of

[35] The government also argues that, if the possibility of removal is considered in a *Blanton* analysis, all sorts of other consequences that may follow after a conviction could also be factors, such as termination of employment and ineligibility for gun ownership. These are not before us. Appellant does not rest his constitutional claim on any of these consequences, and our holding is limited to removal from the country, a penalty that the Court has recognized as grievous and "enmeshed" in the criminal proceeding.

[36] Judge Fisher's dissent suggests that appellant's conviction for sexual abuse of a minor, although it rendered appellant deportable, should not be considered an aggravated felony under the INA. *Post* at 70 n.6. At trial, all parties and the trial judge assumed that it is. Similarly, on appeal before a division of this court and on rehearing en banc, there has been no suggestion otherwise. As a factual matter, the government has acted accordingly, suspending appellant's asylum petition upon commencement of the criminal prosecution.

[37] As applied to offenses in the District of Columbia punishable by a maximum sentence of less than six months that would not be jury demandable under the District's statute, see *supra* note 9, they include: sexual abuse of a minor 8 U.S.C. §§ 1101 (a)(43)(A), 1227 (a)(2)(A)(iii); offenses related to controlled substances (excluding possession of small quantities of marijuana), *id*. § 1227

(continued . . .)

Immigration Appeals ("BIA"),[38] cases from other jurisdictions,[39] and guidance provided by federal agencies charged with administration of admission and exclusion of persons to the United States.[40]

Even if they were not purely hypothetical here, the difficulties that the government fears may come to pass in some other case are too remote and of insufficient import to outweigh the loss of the constitutional right to a jury trial. *Blanton*'s penalty-oriented analysis was intended to safeguard this important right

_____

(. . . continued)
(a)(2)(B); and domestic violence, violation of a protection order, stalking, and child abuse, *id*. § 1227 (a)(2)(E).

[38] The BIA has determined that convictions for certain offenses are crimes involving moral turpitude under 8 U.S.C. §§ 1182 (a)(6)(A)(i) & 1227 (a)(2)(A)(ii), that can result in deportation or exclusion. *See, e.g.*, *Matter of Guillermo Diaz-Lizarraga*, 26 I&N Dec. 847, 852-53 (BIA 2016) (theft crimes). Theft crimes are codified at D.C. Code §§ 22-3211 & 3213 (2012 Repl.).

[39] *See, e.g.*, *Reyes v. Lynch*, 835 F.3d 556, 558 (6th Cir. 2016) (concluding that prostitution is a deportable offense as a crime involving moral turpitude under 8 U.S.C. § 1227 (a)(2)(A)(ii)).

[40] *See, e.g.*, U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL 302.3-2 (B)(2) (U) (Vol. 9 2017) (including fraud (codified at D.C. Code §§ 22-1402 & 1510 (2012 Repl.)) and lewdness (codified at D.C. Code § 22-1312 (2012 Repl.)) within the definition of conduct involving moral turpitude, and excluding gambling (codified at D.C. Code §§ 22-1702, 1703, 1704, 1706, & 1708 (2012 Repl.)), vagrancy (codified at D.C. Code § 22-2302 (2012 Repl.)), disorderly conduct (codified at D.C. Code § 22-1321 (2012 Repl.)), and trespass (codified at D.C. Code § 22-3302 (2012 Repl.)).

where the severity of the potential penalties raises the stakes in a criminal prosecution. In a case where the prosecution and defense are in disagreement on the question of whether an accused will face the serious penalty of deportation if convicted, the trial court is not without resources to come to a sound resolution of the constitutional issue presented. Government counsel are part of the Department of Justice, which has deep expertise in immigration matters and is part of the same executive branch as the Departments of State and Homeland Security, which have responsibility for enforcing the immigration laws. Defense counsel have an obligation to advise their clients competently on the question of immigration consequences. *See Padilla*, 559 U.S. at 369. If necessary, the court presiding over a criminal prosecution can appoint its own expert advisor on immigration law.

We do not expect this to be a common occurrence in Superior Court. Although genuine disputes about deportability might arise in an immigration proceeding, we think they will seldom occur in the context of a pretrial demand for a jury trial. It is not very likely that a defendant would challenge the government's representation in court that an offense is not deportable, or that the government would make such a representation without being confident that its position is

legally correct.[41] The opposite situation, where the government were to assert (contrary to the defendant's view) that a charged offense is deportable, and thus, jury demandable, presents no issue as the defendant may always waive the right to a jury trial. If the trial court nonetheless must decide a jury demand based on a difficult and unsettled question of deportability, it has the obligation — as in so many other areas[42] — to decide the constitutional issue to the best of its ability. *See* D.C. Code § 16-705 (a) (mandating that where the Constitution so requires, trial "shall be by jury" unless waived by defendant). Where a jury trial demand is made in a case with a truly vexing issue of deportability, the trial court can decide to default to recognition of the Sixth Amendment right, and avoid the risk of

---

[41] The defendant could argue that the government's representation in the criminal proceeding provides the basis for judicial estoppel in a later deportation proceeding where the government takes the opposite view. *See United States v. Barahona*, No. 14-DVM-1945, 2014 D.C. Super. LEXIS 19, at *9 n.5 (D.C. Super. Ct. Dec. 12, 2014) (noting that where the government urged the trial court to conclude that the defendants could not be deported following a conviction, the government would then be precluded by the doctrine of judicial estoppel "from taking a contrary position in hypothetical future immigration hearings involving the defendants"); *cf. Mason v. United States*, 956 A.2d 63, 65-66 (D.C. 2008) (judicially estopping a defendant who changed position in different proceedings concerning citizenship status and setting out three factors to be considered in applying judicial estoppel); *Porter Novelli v. Bender*, 817 A.2d 185, 188 (D.C. 2003) (applying judicial and equitable estoppel to prevent a party from arguing contrary legal positions at separate, but related, proceedings). *See generally Ward v. Wells Fargo Bank, N.A.*, 89 A.3d 115, 127-28 (D.C. 2014).

[42] *E.g.*, novel Fourth Amendment motions to suppress and Sixth Amendment claims of ineffective assistance of counsel.

imperiling a conviction that may be obtained after a bench trial, should it eventually be determined that denial of the jury trial demand was based on a flawed judgment on the deportation question. The additional time required for a jury trial may well be offset by the time saved in pretrial argument. Even if some judicial efficiency might be lost, in the weighing of harms and benefits on a constitutional scale, this remote possibility is not a determinative factor.

*** 

We conclude that the penalty of deportation, when viewed together with the 180-day maximum period of incarceration for misdemeanor sexual abuse of a minor, overcomes the presumption that appellant was charged with a petty offense and triggers the Sixth Amendment right to a trial by jury. As appellant was denied his rightful demand for a jury trial, the conviction is reversed and the case is remanded for further proceedings.

*So ordered.*

WASHINGTON, *Senior Judge*, concurring: As my colleagues have made clear in their competing opinions in this case, our attempt to reconcile the Supreme

Court's decisions in *Baldwin v. New York*, 399 U.S. 66 (1970), and *Blanton v. City of N. Las Vegas*, 489 U.S. 538 (1989), with the D.C. Misdemeanor Streamlining Act, *see* Omnibus Criminal Justice Reform Act of 1994, D.C. Law § 10-151, 41 D.C. Reg. 2608 (effective Aug. 20, 1994), has resulted in a decision where two individuals charged with the same misdemeanor crime in the District of Columbia enjoy very different trial rights and privileges due to the severity of the consequences they individually face for committing that crime. I write separately because I am concerned that our decision today, while faithful to the dictates of *Blanton*, creates a disparity between the jury trial rights of citizens and noncitizens that lay persons might not readily understand. That disparity is one that the legislature could and, in my opinion, should address. The failure to do so could undermine the public's trust and confidence in our courts to resolve criminal cases fairly.

In *Baldwin*, the Supreme Court interpreted the Sixth Amendment to the Constitution as guaranteeing a right to a jury trial only in criminal cases where an individual is charged with committing serious crimes. The Court went on to distinguish between serious and non-serious crimes, concluding that a serious crime was one that carried the possibility of incarceration for six months or more. *Baldwin*, 399 U.S. at 69.

In *Blanton*, the Supreme Court, while reiterating that the maximum potential sentence that can be imposed for the commission of a crime is a significant indicator of whether society considers the crime to be serious, also acknowledged that the length of the potential sentence does not necessarily end the inquiry if there are other "objective indications of the seriousness with which society regards the offense." *Blanton*, 489 U.S. at 541 (quoting *Frank v. United States*, 395 U.S. 147, 148 (1969)). As the majority opinion points out, the Supreme Court did not parse whether "the other penalties" were "penal" or "civil" in nature and referenced several penalties that were "civil" in nature when assessing the relative burdens faced by defendants in criminal cases.

The Misdemeanor Streamlining Act (Act), passed in 1994, was designed to "relieve pressure on the court's misdemeanor calendars, allow for more cases to be heard by hearing commissioners, and allow for more felony trials to be scheduled at an earlier date." Council for the District of Columbia, Committee on the Judiciary, Report on Bill 10-98, at 3-4 (Jan. 26, 1994). The Act sought to accomplish these goals by reducing the maximum sentence that could be imposed for the commission of most misdemeanor crimes in the District of Columbia from six months or more to 180 days or less. By reducing the maximum possible

sentence for the majority of misdemeanor offenses, the crimes no longer met the *Baldwin* threshold for serious crimes, and thus, the vast majority of defendants in the District of Columbia charged with misdemeanor crimes were no longer constitutionally entitled to a jury trial. Before today, we rarely, if ever, looked past the legislative intent expressed in the relevant criminal statutes to determine whether the Council and/or Congress intended for the crime to be considered a serious one. However, because we have interpreted *Blanton* as authorizing a broader view of the applicable statutory penalties for determining whether the crime is considered serious, we are in the unenviable position of trying to ascertain legislative intent without the benefit of a well-developed legislative record.

As Justice Gorsuch recently noted in his concurring opinion in *Sessions v. Dimaya*, "[G]rave as th[e deportation] penalty may be . . . many civil laws today impose . . . many similarly severe sanctions." 138 S. Ct. 1204, 1231 (2018) (Gorsuch, J., concurring). That fact has not been lost on this court as we also have recognized that there are significant, if not similarly severe, sanctions that attach to convictions for misdemeanors in the District of Columbia. *See Foote v. United States*, 670 A.2d 366, 370 (D.C. 1996) (noting that appellant's counsel identified collateral consequences to include "residential eviction, forfeiture of assets, revocation of driving privileges, . . . ineligibility for federal benefits, and enhanced

periods of incarceration for repeat offenders") (footnotes omitted); *see also Thomas v. United States*, 942 A.2d 1180, 1186 (D.C. 2008) (condition that defendant register under the Sexual Offender Rehabilitation Act did not render misdemeanor child sexual abuse a jury-demandable crime); *Young v. United States*, 678 A.2d 570, 571 (D.C. 1996) ("[T]he potential loss of a driver's license for one convicted of a misdemeanor drug offense carrying a maximum penalty of six months imprisonment in this jurisdiction does not transmogrify this petty offense into a serious offense requiring a jury trial.").

However, and for the first time, a majority of our court has relied on a collateral civil statutory penalty to transmogrify an otherwise petty offense into a serious crime and that means that the courts likely will be faced with new challenges in individual cases to the Act's limitation on the right to jury trials in misdemeanor cases. The majority opinion sees this as a relatively inconsequential matter as they believe that it will be the rare case where another civil statutory penalty will be considered severe enough to entitle a defendant to a jury trial in a misdemeanor case, while the dissent acknowledges the disparity, but argues that the anomaly supports their position that those of us in the majority are interpreting the Supreme Court's opinion in *Blanton v. United States* too expansively. Regardless, I agree with Justice Gorsuch's comment above that there are many

other severe civil statutory penalties that have been attached to criminal convictions, in addition to deportation and, because it is the legislature's intent that must guide our analysis, the Council should speak clearly to the issue of whether the civil penalties that attach to certain misdemeanor crimes reflects a legislative judgment that the commission of those crimes is more serious than the potential criminal sentence might suggest. *See Blanton*, 489 U.S. at 541-42 ("The judiciary should not substitute its judgment as to seriousness for that of a legislature, which is 'far better equipped to perform the task, and is likewise more responsive to changes in attitude and more amenable to the recognition and correction of their misperceptions in this respect.'") (brackets and citation omitted).

Alternatively, the Council could reconsider its decision to value judicial economy above the right to a jury trial. Restoring the right to a jury trial in misdemeanor cases could have the salutary effect of elevating the public's trust and confidence that the government is more concerned with courts protecting individual rights and freedoms than in ensuring that courts are as efficient as possible in bringing defendants to trial. This may be an important message to send at this time because many communities, especially communities of color, are openly questioning whether courts are truly independent or are merely the end game in the exercise of police powers by the state. Those perceptions are fueled

not only by reports that police officers are not being held responsible in the courts for police involved shootings of unarmed suspects but is likely also promoted by unwise decisions, like the one that authorized the placement of two large monuments to law enforcement on the plaza adjacent to the entrance to the highest court of the District of Columbia.

One of the ways that the founders sought to ensure that citizens were protected from overreaching by the government was to guarantee a right to a jury trial to anyone charged with a crime. John Adams is famously quoted as saying, "Representative government and trial by jury are at the heart and lungs of liberty," *Rauf v. State*, 145 A.3d 430, 465 n.216 (Del. 2016) (quoting Statement of John Adams (1774)), and Thomas Jefferson "consider[ed] a trial by jury as the only anchor . . . imagined by man by which a government can be held to the principles of its constitution." Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in* 15 The Papers of Thomas Jefferson, 27 March 1789-30 November 1789, 266 (Julian P. Boyd ed., 1958), http://founders.archives.gov/documents/Jefferson/01-1502-0259. It is why the right to a jury trial is enshrined in the Sixth Amendment to the Constitution. And, while the D.C. Council complied with the letter of the law when it reduced the potential sentences for misdemeanor crimes to a level that made them non-jury demandable, that decision made us one of the few

state court jurisdictions in the country that does not guarantee a right to a jury trial for those charged with criminal misdemeanors.[1] Most states recognize that a jury trial in criminal cases is critically important because of the stigma that

---

[1] The majority of jurisdictions provide for the right to a jury trial where a "petty" offense is charged, *see generally Fretes-Zarate v. United States*, 40 A.3d 374, 378 n.3 (D.C. 2012) (noting that "only nine states (Delaware, Louisiana Mississippi, Nebraska, Nevada, New Jersey, New York, Pennsylvania, and Rhode Island) and the District limit the right to a jury trial to individuals charged with crimes carrying a sentence of more than 180 days"). Three additional states place some restrictions on the right to a jury trial for criminal offenses with penalties of six months or less of incarceration, but the outright denial of jury trials are much more limited. In Arizona, the right to a jury trial for misdemeanor offenses extends to charges only where the offense falls within a specific category, regardless of whether the statutory offense bears a penalty of six months or less of incarceration. *See Derendal v. Griffith*, 104 P.3d 147, 153-54 (Ariz. 2005) (en banc) (delineating the test for determining jury eligibility for misdemeanor offenses in Arizona); *see also* ARIZ. REV. STAT. ANN. § 28-1381 (2017) (providing right to jury trial for misdemeanor offense of driving or actual physical control of a vehicle while under the influence where maximum punishment is up to six months incarceration); *State v. Kalauli*, 414 P.3d 690, 696 (Ariz. Ct. App. 2018) (noting that "one charged with violating the unified crime of theft is entitled to a jury trial, regardless of the degree of the offense or the nature of the property alleged to have been taken"); *cf. Fushek v. State*, 183 P.3d 536, 540-41 (Ariz. 2008) (en banc) (providing the right to a jury trial in any case where "the state has made a special allegation of sexual motivation"). In North Carolina, individuals charged with criminal misdemeanors are granted a bench trial first, then if found guilty, granted a jury trial. *See* N.C.G.S.A. § 15-173. Similarly, in Virginia, a "criminal defendant . . . may be tried for a misdemeanor in a district court without a jury, even though the misdemeanor carries a potential sentence in excess of six months." Right to trial by jury, VA. PRAC. CRIMINAL PROCEDURE § 16:3 (Dec. 2017) (citing *Manns v. Virginia*, 191 S.E.2d 810 (Va. 1972)). "This is not a violation of the federal constitutional standard because Virginia authorizes an appeal of right and a trial *de novo* in the circuit court. The Virginia procedure thus extends beyond the federal standard because it guarantees an eventual right to a

(continued . . .)

accompanies a criminal conviction and many of those states accept the fact that any period of incarceration, no matter how short, can have a devastating impact on one's life and livelihood. *See, e.g.*, *State v. Benoit*, 311 P.3d 874, 882 (Or. 2013) (en banc) (requiring that any defendant subjected to pretrial arrest and detention be provided a jury trial, even if the state reduces such charge to a citation-only violation, as "[t]he stigma caused by criminal pre-charging procedures will not disappear when the prosecutor elects to charge a civil infraction") (quoting *State v. Freeman*, 487 A.2d 1175, 1178 (Me. 1985)); *State v. Weltzin*, 630 N.W.2d 406, 410 (Minn. 2001) (broadening the right to a jury trial to include all prosecutions where the penalty includes any incarceration).

So, perhaps the answer to the anomaly created by our decision today is to hew more closely to the plain language of the Sixth Amendment and make no distinction between serious and petty crimes when it comes to an individual's right to a jury trial. If the Council chooses this latter path, it will not only address the disparity created by our attempt to faithfully apply *Blanton* in this case, but the District would also be rejoining the majority of other states where a jury trial in a

_____
(. . . continued)
jury trial regardless of the length of the possible sentence." *Id.* (citing Va. Code Ann. §§ 16.1-132, 16.1-136, and *Ludwig v. Massachusetts*, 427 U.S. 618 (1976)).

criminal case is the norm, and not the exception. To me, this latter approach has many virtues.

THOMPSON, *Associate Judge*, concurring in the judgment: The Supreme Court has instructed that, pursuant to the Sixth Amendment, a defendant who faces a maximum prison term of six months or less "is entitled to a jury trial . . . if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they *clearly reflect* a legislative determination that the offense in question is a 'serious' one."[1] *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 543 (1989) (emphasis added); *United States v. Nachtigal*, 507 U.S. 1, 3-4 (1993). Especially after the Supreme Court's opinion in *Padilla v. Kentucky*, 559 U.S. 356 (2010), I believe there is little room for dispute that deportation or "removal," which the federal immigration statute prescribes for non-citizens convicted of any of a broad range of crimes, is a "particularly severe [statutory] penalty,"[2] *id.* at 365, and "is an integral part —

---

[1] For the reasons I explain, I believe the italicized language is critical to our resolution of this appeal.

[2] Deportation "may result in the loss of all that makes life worth living." *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (internal quotation marks omitted). It

(continued . . .)

indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants who [are found] guilty [of] specified crimes." *Id.* at 364 (footnote omitted); *see also Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204, 1209 (2018) (reiterating that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence," and that "removal proceedings [have become] ever more intimately related to the criminal process" (internal quotation marks omitted)).  Under the test set out in *Blanton*, however, to determine whether the immigration statute's prescription of deportation as an additional penalty for a non-citizen convicted of a specified criminal offense triggers the Sixth Amendment right to trial by jury, we must also ask whether the penalty of deportation "clearly reflect[s]" a determination by Congress that the offense is a "'serious' one." *Blanton*, 489 U.S. at 543.

In my view, we have no basis for concluding that Congress's prescription of deportation for non-citizens who are found to have committed *any* of the criminal offenses to which the deportation penalty is attached *clearly* reflects a determination by the legislature that all such offenses are serious ones.  Congress

_____
(. . . continued)
is "at times the equivalent of banishment or exile." *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948).

has broadly declared as "deportable" offenses everything from possession of any more than 30 grams of marijuana to mass murder. Its declaration that conviction — of any of a long list of enumerated but quite different types of offenses — renders a non-citizen "deportable" is scant if any evidence that it views the offenses as serious in the Sixth Amendment sense. Indeed, as other courts have recognized, in general, the immigration-law treatment of a non-citizen convicted of a "deportable" crime frequently turns not on the seriousness of the crime committed but on the status of the non-citizen in other respects. For example, in *Reyes v. Holder*, 714 F.3d 731 (2d Cir. 2013), the Second Circuit focused on the fact that an *unadmitted* alien convicted of a deportable "crime of moral turpitude" can qualify for a so-called "petty offense exception" to removal, while "[a] conviction involving [the same] petty offense . . . may still render an admitted alien *deportable*[.]" *Id.* at 735.[3] The Second Circuit explained that "[a]lthough it may seem anomalous that a legally admitted alien can be rendered ineligible for special rule cancellation of removal while an unadmitted alien who committed *the same crime* can remain eligible, we have previously noted that Congress's harsher treatment of legal permanent residents ('LPRs') may be justified on the basis that

---

[3] "Under the petty offense exception, a conviction for an offense involving moral turpitude does not render an unadmitted alien *inadmissible* . . . when (1) the maximum penalty possible was a year or less, and (2) the alien was actually sentenced to less than six months in prison." *Id.*

'an LPR's violation of American laws represents a greater betrayal or poses a heightened concern of recidivism, and therefore calls for harsher measures under the immigration laws.'" *Reyes v. Holder*, 714 F.3d at 737 (quoting *Jankowski-Burczyk v. INS*, 291 F.3d 172, 179 (2d Cir. 2002)) (citing *Gonzalez-Gonzalez v. Ashcroft*, 390 F.3d 649, 652 (9th Cir. 2004) ("LPRs enjoy substantial rights and privileges not shared by other aliens, and therefore it is arguably proper to hold them to a higher standard and level of responsibility than non LPRs.")). The *Reyes* court also described Congress's action in amending the immigration statute in an attempt to "prevent the mass deportation of aliens who had arrived from some former Soviet bloc and Central American nations," by allowing them, including individuals with certain criminal convictions, to apply for "'special rule' protection from deportation." *Reyes*, 714 F.3d at 733 (quoting *Tanov v. INS*, 443 F.3d 195, 199 (2d Cir. 2006)); *see* 8 C.F.R. § 1240.66 (c) (2014). It might be said in short that immigration-law consequences of criminal conduct have less to do with the seriousness of offenses and more to do with a variety of other congressional policies and objectives with respect to characteristics of the offenders themselves.

Furthermore, in the immigration statute, Congress has afforded non-citizens who have been convicted of some "deportable" offenses avenues of relief to avoid actual removal. *See* 8 U.S.C. § 1229b (a)(3) ("The Attorney General may cancel

removal in the case of an alien who is inadmissible or deportable from the United States if the alien . . . has not been convicted of any aggravated felony" (emphasis added)). This, I believe we can conclude, is a signal from Congress that some offenses that expose non-citizens to the threat of deportation are not so serious after all. At the very least, the fact that Congress has authorized cancellation of removal for non-citizens convicted of any of a number of crimes precludes us from finding that the general penalty of removal "*clearly reflect*[s] a legislative determination that [such] offense[s] . . . [are] 'serious' one[s]."[4] *Blanton*, 489 U.S. at 543. Stated differently, the provisions of the federal immigration statute that render a convicted non-citizen "deportable" do not "furnish[] us with [an] objective criterion by which a line could . . . be drawn . . . between offenses that [Congress does or does not] regard[] as 'serious[.]'" *Baldwin v. New York*, 399 U.S. 66, 72-73 (1970).

By contrast, with respect to one category of offenses — those that Congress has termed "aggravated felonies" — Congress has given what I believe are clear

---

[4] That is, the fact that a non-citizen, upon conviction of a particular offense, is rendered "deportable" pursuant to one provision of the immigration statute, cannot be taken as a clear measure of the seriousness of the offense where, under another provision of the same statute, Congress has created a path for the convicted non-citizen to avoid deportation.

signals that it regards the offenses as serious. In 8 U.S.C. § 1229b (a)(3), Congress has provided that ("[t]he Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States *if the alien . . . has not been convicted of any aggravated felony*" (emphasis added)). As the Supreme Court recognized just this term in *Dimaya*, "removal is a virtual certainty for an alien found to have an aggravated felony conviction." 584 U.S. at  , 138 S. Ct. at 1211; s*ee also Lopez v. Gonzales*, 549 U.S. 47, 50 (2006) ("[T]he Attorney General's discretion to cancel the removal of a person otherwise deportable does not reach a convict of an aggravated felony."); *United States v. Couto*, 311 F.3d 179, 183-84 (2d Cir. 2002) ("[T]he Immigration and Nationality Act eliminated all discretion as to deportation of non-citizens convicted of aggravated felonies[.]"); 8 C.F.R. § 1240.66 (c)(1) (2018) (providing that a non-citizen is ineligible for special rule cancellation if he or she has an aggravated felony conviction); Susan Pilcher, *Justice Without a Blindfold: Criminal Proceedings and the Alien Defendant*, 50 Ark. L. Rev. 269, 329 (1997) ("[A]voidance of an aggravated felony charge will often be of paramount concern, even at the cost of pleading guilty to an arguably more serious crime of moral turpitude, insofar as options for relief from deportation or waivers of future inadmissibility may remain available for the latter.").[5]

---

[5] There are a few avenues of limited relief for a non-citizen who has been

(continued . . .)

Further, in 8 U.S.C. § 1158 (b)(2)(A)(ii), Congress has provided that a non-citizen is ineligible for asylum if the Attorney General determines that the non-citizen, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." And through 8 U.S.C. § 1158 (b)(2)(B)(i) (2006), it has provided in addition that "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime" for the purpose of 8 U.S.C. § 1158 (b)(2)(A)(ii). *See Santos-Infante v. Att'y Gen. of the United States*, 574 F. App'x 142, 145 n.2 (3d Cir. 2014) ("An alien convicted of an aggravated felony is considered to have been convicted of a particularly serious crime for purposes of the asylum statute. . . . Such an alien is ineligible for asylum.").

_____

(. . . continued)
convicted of an aggravated felony. Such a non-citizen may be eligible for withholding or deferral of removal in accordance with this nation's obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). *See* 8 U.S.C. § 1231 (b)(3)(A) (2006) (providing that the Attorney General "may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"); 8 C.F.R. § 1208.16 (c)(2) (2018) (providing for withholding of removal if the non-citizen establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal"); 8 C.F.R. § 1208.17 (a) (2018) (providing for deferral of removal to the country where a non-citizen "is more likely than not to be tortured"). But these types of relief do not preclude the non-citizen from being deported to another country. *See* 8 C.F.R. § 1208.16 (f) (2018) ("Nothing in [§ 1208.16 or in 8 C.F.R.] § 1208.17

(continued . . .)

As I explained in my now-vacated opinion for the Division in this matter, if we are to take potential immigration consequences into account as a measure of the seriousness of an offense in Congress's estimation, I believe it is appropriate to look to whether Congress has at the same time provided avenues of relief whereby individuals convicted of a deportable offense may have the penalty of removal canceled — and, conversely, to whether, as to some deportable offenses, Congress has statutorily shut down all avenues of relief from removal. Congress's harsh treatment of non-citizens convicted of aggravated felonies, admitting of no exceptions, leaves no room for doubt that Congress views these as serious offenses, no matter the status of the offender. In light of the bars to relief from removal for non-citizens who have been convicted of aggravated felonies, I am satisfied that the crimes Congress has designated as falling within this category are offenses for which Congress has mandated statutory penalties that "clearly reflect a legislative determination that the offense[s] . . . [are] 'serious' one[s]." *Blanton*, 489 U.S. at 543.

_____

(. . . continued)

shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.").

The parties agree that appellant Bado, a non-citizen, was convicted of an aggravated felony. *See* 8 U.S.C. § 1101 (a)(43)(A) (defining "aggravated felony" to include "sexual abuse of a minor"). At the time he made his jury demand, it was known that conviction of the crimes with which he was charged (three counts of misdemeanor sexual abuse of a child, in violation of D.C. Code § 22-3010.01 (2001)) would render him ineligible for cancellation of removal and ineligible for the asylum he was actively seeking before an immigration judge at the time he went to trial in the instant matter. Thus, he was charged with offenses that exposed him to inevitable statutory penalties, an inevitability by which Congress has clearly signaled that it regards the offenses as serious. For that reason, applying the teaching of *Blanton*, I conclude that Mr. Bado was entitled to a jury trial.[6]

---

[6] It is worth noting that many (if not most) of the offenses designated as "aggravated felonies" under the federal immigration statute have statutory maximum periods of imprisonment under District of Columbia law that are in excess of 180 days, meaning that a defendant facing trial for them in the District of Columbia is already statutorily entitled to a jury trial. *See, e.g.*, 8 U.S.C. § 1101 (a)(43)(F) (treating a "crime of violence . . . for which the term of imprisonment [is] at least one year" as an aggravated felony); 8 U.S.C. § 1101 (a)(43)(G) (treating "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year" as an aggravated felony); *see also Lopez v. Gonzales*, 549 U.S. 47, 55-60 (2006) (holding that for a drug crime to be an aggravated felony, it must be an offense for which the maximum term of imprisonment authorized for the offense under federal law is more than one year).

One final observation:  The rationale I have set out above would afford non-citizens a jury trial when they are threatened almost inevitably with removal from this country (a fate that may be of greater concern to a convicted non-citizen than any jail sentence).  It does so, however, without expanding the right to a jury trial to non-citizens in circumstances that (as Senior Judge Washington notes in his concurrence) may be impossible to distinguish from those of our fellow citizens who likely will face severe collateral consequences from misdemeanor convictions, but who, under our statutory and case law, have no right to a jury trial.

For this reason, too, I believe the rationale and result set out above are the most appropriate resolution of the issue presented in this case.

GLICKMAN, *Associate Judge*, with whom FISHER, *Associate Judge*, joins, dissenting:  I join Judge Fisher's dissent and wish only to elaborate on one point. In *Blanton v. City of N. Las Vegas*, the Supreme Court instructed that the Sixth Amendment right to a trial by jury turns on the seriousness of the charged offense in the eyes of the legislature that enacted it, as indicated by the severity of the penalties *that* legislature chose to attach to the offense.[1]  "A defendant is entitled to

---

[1] *See* 489 U.S. 538, 541-43 (1989).  It perhaps is something of an open question whether non-punitive consequences are to be considered as penalties for

(continued . . .)

a jury trial . . . *only* if he can demonstrate" that those penalties – which consist of "the maximum authorized period of incarceration" together with "any additional statutory penalties" – "are so severe that they clearly reflect *a legislative determination* that the offense in question is a 'serious' one."[2] The views of other legislatures about the seriousness of the offense, and any additional penalties other legislatures impose upon persons convicted of that offense, are irrelevant to whether a particular defendant is entitled to a jury trial in a prosecution for that offense by the jurisdiction that enacted it.[3]

_____

(. . . continued)

the purpose of determining whether there is a constitutional right to a jury trial. I am inclined to think that only statutory penalties intended as or equating to criminal punishment should be considered. *See id.* at 541-42 ("In fixing the maximum penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense.' . . . We thus examine 'whether the length of the authorized prison term *or the seriousness of other punishment* is enough in itself to require a jury trial.'") (emphasis in the original; citations omitted). Despite its severity, the removal or deportation of an alien under federal immigration law is not criminal punishment. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).

[2] *Blanton*, 489 U.S. at 543 (emphasis added).

[3] *See id.* at 545 n.11 ("We decline petitioners' invitation to survey the statutory penalties for [the charged crime] in other States. The question is not whether other States consider [the charged crime] a 'serious' offense, but whether Nevada does."). My colleagues in the majority appear to misunderstand *Blanton*'s statement that the Supreme Court has "frequently looked to the federal classification scheme in determining when a jury trial must be provided." *Id.*; see *ante* at 27 n.29. The Court viewed Congress's (former) definition of a "petty" offense (as a misdemeanor for which the maximum penalty did not exceed

(continued . . .)

The legislature that enacted the offense in the present case – misdemeanor sexual abuse of a minor – was the Council of the District of Columbia. A noncitizen defendant's conviction of that offense exposes him to the revocation of his or her privilege to remain in this country only under federal immigration law – law enacted by Congress. Deportation is a very severe penalty, but it is not a seriousness-defining penalty attached to misdemeanor sexual abuse of a minor by

---

(. . . continued)

imprisonment for six months and a $5,000 fine) as a relevant indicator of what constitutes a "petty" offense for Sixth Amendment purposes and whether the penalties imposed by a State for a given offense are severe enough to trigger the constitutional right to a jury trial. In no way does this imply that Congress's own view of the seriousness of a State offense or the add-on consequences imposed by Congress in the event of a conviction of a State offense have any bearing on whether the defendant has a right to a jury trial in a State prosecution for that offense. *See also Ivy v. United States*, 2010 U.S. Dist. LEXIS 28933,*8 (W.D. Ky. March 26, 2010) (holding the fact that defendant, if convicted in Kentucky, would have to register as a sex offender in Tennessee did not affect the *Blanton* analysis because "Tennessee's view of the seriousness of the Kentucky statute is not relevant to determination of the seriousness of that statute"); *Rauch v. United States*, 2007 U.S. Dist. LEXIS 72616, *8-*9 (E.D. Cal. Sept. 28, 2007) (obligation under California law to register as a sex offender upon conviction of federal misdemeanor offense did not entitle defendant to a jury trial on that offense; "Congress enacted 18 U.S.C. Section 2244 (b), not the California legislature. Thus the view of the State of California as to the seriousness of the offense is not relevant. Further, only 'statutory penalties' are to be considered as to the seriousness of the offense, and California's registration requirement is not a 'statutory penalty' for this offense, as it was not enacted by Congress in conjunction with Section 2244 (b).").

the legislature that enacted the offense.[4] It therefore has no bearing on whether the defendant is entitled to a jury trial in a prosecution for the crime.

Under District of Columbia law, the gravity of misdemeanor sexual abuse of a minor is the same regardless of whether the crime is committed by a citizen or by an alien subject to removal. The maximum penalties that the District of Columbia Council has chosen to impose for commission of this offense by either a citizen or an alien are the same – 180 days in prison and a $1,000 fine[5]– and they clearly are not onerous enough by themselves to trigger a right to a jury trial. A defendant convicted of misdemeanor sexual abuse of a minor also is required to register as a sex offender for ten years under the District of Columbia Sex Offender Registration Act ("SORA").[6] The SORA is "not punitive and does not inflict

---

[4] Although the District of Columbia is not a State, and its government is a creation of Congress, I take it as a settled principle of Home Rule that we do not conflate Council legislation with Congressional legislation and that the principles enunciated in *Blanton* apply here.

[5] The District of Columbia also assesses up to $250 "[i]n addition to and separate from punishment imposed" for a misdemeanor conviction. D.C. Code § 4-516 (a) (2012 Repl.).

[6] *See* D.C. Code § 22-4001 (2012 Repl.).

punishment,"[7] however, and this court previously has held that addition of the registration requirement does not render misdemeanor child sexual abuse a jury-demandable offense under the Sixth Amendment.[8] I conclude that appellant did not have a constitutional right to a jury trial in the present case.

Accordingly, for the above reasons (and for the reasons set forth in Judge Fisher's dissent), I respectfully dissent.

FISHER, *Associate Judge*, with whom GLICKMAN, *Associate Judge*, joins, dissenting: According to the majority, a citizen charged with misdemeanor sexual abuse of a child does not have a right to a jury trial, but a noncitizen charged with the very same offense does. This is a startling result, neither compelled nor justified by Supreme Court precedent. It most certainly is not, as the majority asserts, "a straightforward application of a *Blanton* analysis." Maj. Op. at 16. Under *Blanton*, the seriousness of the offense is not measured on a case-by-case basis. Moreover, in my judgment, the prospect of removal (even the certainty of

---

[7] *In re W.M.*, 851 A.2d 431, 446 (D.C. 2004); *see also In re Doe ("S.D.")*, 855 A.2d 1100, 1102 (D.C. 2004) ("SORA is a remedial regulatory enactment and not a penal law[.]").

[8] *Thomas v. United States*, 942 A.2d 1180, 1186 (D.C. 2008).

removal) from the United States is not relevant to determining whether the crime is a "serious" offense to which the right of trial by jury applies.

If the maximum term of imprisonment is six months or less, a crime "is presumptively a petty offense to which no jury trial right attaches." *United States v. Nachtigal*, 507 U.S. 1, 4 (1993). A defendant may rebut this presumption, but "only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 543 (1989). This will be a "rare situation," the Court observed. *Id*. Indeed, "there has not yet been a case in which the [Supreme] Court found that an offense with a maximum authorized incarceration period of 6 months was a serious one so as to require a jury trial under the Sixth Amendment." *State v. Woolverton*, 371 P.3d 941, 944 (Kan. App. 2016).

Under *Blanton* and related Supreme Court decisions, the right to a jury trial turns on the seriousness of the charged offense in the eyes of the legislature that created it, as indicated by the severity of the penalty authorized and made applicable across the board to anyone who commits it. "In fixing the maximum

penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense.'" *Blanton*, 489 U.S. at 541 (quoting *Frank v. United States*, 395 U.S. 147, 149 (1969)). The seriousness of the offense is *not* measured on a case-by-case basis by the varying additional consequences an individual defendant might suffer based on his own circumstances unrelated to commission of the crime.

The key question for us—one that the Supreme Court has not addressed—is whether deportation or removal (a consequence imposed by a different legislature) is the type of penalty that counts for purposes of determining the right to a jury trial. I think it does not. Deportation or removal is not part of the criminal penalty. It is, rather, a result (serious, no doubt) of abusing the privilege of living in this country.

We have addressed this question in three previous cases, each time rejecting the argument. *Foote v. United States*, 670 A.2d 366, 372 (D.C. 1996) ("[T]he remedies which Foote seeks to treat as criminal penalties could be imposed only in hypothetical civil or administrative proceedings (*e.g.*, eviction, forfeiture of assets, deportation or exclusion, driver's license revocation)."); *Olafisoye v. United States*, 857 A.2d 1078, 1084 (D.C. 2004) ("[A]dministrative deportation proceedings do

not raise an otherwise petty offense to the level requiring a jury trial."); *Fretes-Zarate v. United States*, 40 A.3d 374, 374 (D.C. 2012) (post-*Padilla* decision applying plain error standard of review and rejecting defendant's argument "that she had a constitutional right to a trial by jury for [simple assault] because a conviction subjects her to deportation under federal immigration law"). These decisions do not bind the en banc court, and some of this language may be dictum, but the reasoning is sound.

My colleagues rely much too heavily on *Padilla v. Kentucky*, 559 U.S. 356 (2010), which addressed a claim of ineffective assistance of counsel but said nothing about the right to a jury trial. It is one thing to say (as *Padilla* did) that a lawyer is required to assist her client in understanding the immigration consequences he will face by pleading guilty (regardless of whether those consequences are called "collateral" or "direct"). It is quite a different matter to conclude that the downstream consequence of deportation transforms a petty offense into a serious one.

*Padilla* does describe "deportation [as] an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla*, 559 U.S. at 364

(footnote omitted).  Nevertheless, the Supreme Court acknowledged, "it is not, in a strict sense, a criminal sanction."  *Id*. at 365.  That acknowledgment makes all the difference.  We should not lose sight of the fact that *Padilla* did not purport to address the question presented here.

The fact that removal will be a consequence if one is convicted of a certain crime does not mean it is a penalty or punishment that overcomes the presumption that the charge is a petty offense.[1]  "Primary emphasis . . . must be placed on the maximum authorized period of incarceration."  *Blanton*, 489 U.S. at 542.  The operation of this principle is shown in cases of defendants who happen to be on probation (or another form of supervised release) for an earlier offense.  Even the

---

[1]  When applying other constitutional protections, the Supreme Court has deemed it "well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment."  *Mahler v. Eby*, 264 U.S. 32, 39 (1924).  As a result, courts have held that removal from the United States does not implicate the constitutional prohibitions against *ex post facto* laws, *Harisiades v. Shaughnessy*, 342 U.S. 580, 594-95 (1952); double jeopardy, *De La Teja v. United States*, 321 F.3d 1357, 1364-65 (11th Cir. 2003); or cruel and unusual punishment, *Eid v. Thompson*, 740 F.3d 118, 126 (3d Cir.), *cert. denied*, 135 S. Ct. 175 (2014), because deportation is not a criminal punishment.  The Supreme Court has also held that evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures cannot be excluded from deportation proceedings, recognizing that "[t]he purpose of deportation is not to punish past transgressions . . . ."  *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) ("While the consequences of deportation may assuredly be grave, they are not imposed as a punishment . . . .").

predictable consequence of additional incarceration does not count as part of the punishment when determining whether a jury trial is required.

For example, in *Brown v. United States*, 675 A.2d 953 (D.C. 1996), the defendant's conviction of a new offense led another judge to revoke his probation for a prior conviction, and he was sentenced to serve an additional 120 days in prison. Brown argued that this added punishment entitled him to a jury trial. We rejected that argument, holding that "[t]he fact that this revocation was triggered by the present offense does not make the additional 120 days in prison part of the punishment for this second offense." *Id.* at 955. Similarly here, removal may be triggered by the criminal conviction, but that causal link does not make removal part of the punishment for the crime.

It has mattered to us before, and it should matter still, that removal is not part of the criminal process. It is not within the power of the trial judge to impose that consequence. *See Foote*, 670 A.2d at 370, 372 (pointing out that "these sanctions and remedies [including "exclusion or deportation from the United States"] are not punishment for violations of the drug possession or PDP statutes, and the trial judge had no authority to impose them as part of Foote's sentence"); *People v. Suazo*, 45 N.Y.S.3d 31, 32 (N.Y. App. Div.) ("Despite the gravity of the

impact of deportation on a convicted defendant (*see Padilla . . .* ), deportation consequences are still collateral . . . and do not render an otherwise petty offense 'serious' for jury trial purposes."), *leave to appeal granted*, 29 N.Y.3d 1087 (2017).

The maximum period of incarceration is not the only relevant penalty, but *Blanton* requires us to ask whether any "additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." 489 U.S. at 543. When honoring this command, we must keep firmly in mind that we are dealing here with two different legislatures. The immigration laws are enacted by Congress, while the offense at issue here was created by the Council of the District of Columbia.

Under *Blanton*'s holding, "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature." 489 U.S. at 541. The government therefore urges us to focus on the penalties assigned by the Council, the legislature which created the offense. *See id.* at 545 n.11 (declining "invitation to survey the statutory penalties for drunken driving in other States. The question is not whether other States consider drunken driving a 'serious' offense, but whether Nevada

does."). The majority quickly dismisses this important question.[2] But the "same legislature" argument mattered to us in *Brown*, where the defendant argued that the crime of drug possession was a "serious" offense because federal law punished the equivalent crime by a maximum penalty of one year in prison. We concluded that "[t]he question is not whether some other legislative authority, such as Congress, considers an offense 'serious,' but whether the Council of the District of Columbia does so." *Brown*, 675 A.2d at 955.[3]

Does the seriousness of the offense vary depending on the identity of the defendant? The Supreme Court has never suggested that it does. To the contrary,

---

[2] Congress has plenary power to legislate for the District of Columbia and may enact our criminal laws. U.S. Const., art. I, § 8, cl. 17. I thus do not question Congress's power to enact a penal statute applicable exclusively to the District of Columbia which provides that any noncitizen found guilty of misdemeanor sexual abuse of a child shall be removed from the country as part of the punishment for committing that crime. But that is only a theoretical possibility. Congress has not purported to do so here.

[3] *See also Amezcua v. Eighth Judicial Dist. Ct.*, 319 P.3d 602, 605 (Nev. 2014) (potential federal immigration consequences "are not relevant because they do not reflect a determination by the Nevada Legislature that first-offense domestic battery is a serious offense"), *cert. denied*, 134 S. Ct. 2895 (2014); *cf. State ex rel. McDougall v. Strohson*, 945 P.2d 1251, 1256 (Ariz. 1997) (in determining whether defendant has right to jury trial under Arizona Constitution, Arizona courts have traditionally "look[ed] only to the consequences of conviction under Arizona law"; "[W]e do not consider the risk of deportation in determining whether the defendant is entitled to a jury trial on the state charge.").

the Court has emphasized that the focus must be on the offense charged, "not the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996). In *Lewis*, for example, the defendant was charged with two petty offenses and faced a potential aggregate sentence of twelve months' imprisonment. Nevertheless, the Court rejected his claim that he should have been tried by a jury: "Where we have a judgment by the legislature that an *offense* is 'petty,' we do not look to the potential prison term faced by a *particular defendant* who is charged with more than one such petty offense." *Id*. (emphasis in original).[4]

To be sure, a recidivist may be entitled to a jury trial when a first offender would not be, but that is because the penal statutes expressly subject him to a longer period of incarceration. In other words, a recidivist is deemed to have committed an aggravated form of the offense—in essence, a *different* offense with a different maximum sentence.

---

[4] *See also State ex rel. McDougall v. Strohson*, 945 P.2d 1251, 1256 (Ariz. 1997) ("In our earlier cases, we have never determined jury eligibility based upon an analysis of the individual defendant before the court. If we were to do so now, we would have the anomalous situation where some persons would be entitled to a jury trial and others would not, although charged with exactly the same substantive Arizona crime.").

Apart from being unprecedented, the majority's analysis enormously complicates the practice of criminal law. "Immigration law can be complex, and it is a legal specialty of its own." *Padilla*, 559 U.S. at 369. The majority's holding signals that issues of immigration law will become the central focus of criminal litigation whenever a noncitizen has been charged with an offense that ordinarily does not require a trial by jury. Trial judges and practitioners of criminal law will have to acquire the expertise to make these judgments. *See Suazo*, 45 N.Y.S.3d at 32 (finding it "to be highly impracticable . . . to analyze the immigration consequences of a particular conviction on the particular defendant"). I would not add this complexity unless convinced that the Supreme Court has required it.

Although the majority chooses not to think about them, Maj. Op. at 32 n.34, further complications are certain to follow. Defendants inevitably will rely upon the majority's flawed analysis in an effort to distinguish themselves from others charged with the same offense. Will a doctor who stands to lose his professional license if convicted be entitled to a jury trial although a day laborer will not?[5]

---

[5] *But see Smith v. United States*, 768 A.2d 577, 580 (D.C. 2001) ("[W]e have no difficulty concluding that the legislature did not intend that potential termination [of police officer defendant if convicted should] elevate a petty crime such as simple assault to a jury-demandable offense.").

What about a defendant who may be evicted from public housing or lose (or be denied) other government benefits if he is convicted?[6]

A citizen charged with this offense would not be entitled to a jury trial. The answer should be the same for Mr. Bado. I respectfully dissent.

---

[6] I also note the incongruity of treating a misdemeanor as an "aggravated felony." The government does not protest, so the issue is not before us, and there is immigration law which endorses this oddity. Nevertheless, it is not clear to me that the Supreme Court would agree that *misdemeanor* sexual abuse of a child is an aggravated *felony*. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1570 (2017) (noting that "the INA lists sexual abuse of a minor in the same subparagraph as 'murder' and 'rape,' [8 U.S.C.] § 1101 (a)(43)(A)—among the most heinous crimes it defines as aggravated felonies. § 1227(a)(2)(A)(iii). The structure of the INA therefore suggests that sexual abuse of a minor encompasses only especially egregious felonies.").